## GREGORY THOMAS *v.* WARDEN, STATE PRISON

Superior Court, Judicial District of Hartford
File No. CV-02-0814633S

Memorandum filed August 30, 2005

*Brett Dignam*, with whom were *Adam Sofen, Jordan Factor, Melissa Miksch* and *Max Weinstein*, law student interns, for the petitioner.

*Lynn D. Wittenbrink*, assistant attorney general, for the respondent.

HON. RICHARD M. RITTENBAND, JUDGE TRIAL REFEREE. This is a *very unusual petition for habeas*

*corpus* filed by Gregory Thomas, the petitioner, on or about February 1, 2002, claiming that he has been wrongly classified as a sex offender by the warden of the state prison, the respondent, even though he was acquitted of a sexual assault charge after trial to a jury. When he was convicted of other charges, the latter conviction resulted in his present incarceration. The respondent filed a motion to dismiss, which this court granted on October 15, 2002. The court's decision at that time was based on its lack of subject matter jurisdiction because, as it has been previously found, there is no liberty interest in inmate classification. The court cited *Wheway* v. *Warden*, 215 Conn. 418, 430–31, 576 A.2d 494 (1990), and *Neal* v. *Shimoda*, 905 F. Sup. 813, 818 (D. Haw. 1995), rev'd in part, 131 F.3d 818 (9th Cir. 1997), in support of this proposition. It should be noted that in previous habeas cases, *this very court* has found that there is no liberty interest in inmate classification.

The United States Court of Appeals for the Ninth Circuit, however, overruled the District Court in *Neal* v. *Shimoda*, 131 F.3d 818, 831 (9th Cir. 1997), and held that there *is a liberty interest in not being classified as a sex offender.*

The petitioner, on or about December 2, 2002, filed a motion to reconsider on the basis of *Neal.* The petitioner had brought his original petition pro se but became represented by counsel on May 1, 2003. On that date, an appearance on his behalf was filed by Yale University Law School's Jerome N. Frank Legal Services Organization. The court held a hearing on the motion to reconsider on May 13, 2003, which was followed by the submission of briefs by the parties and a further hearing on November 13, 2003. By a memorandum of decision dated November 17, 2003, this court granted the motion for reconsideration, finding that it did have jurisdiction. The previous dismissal was vacated. *The court also indicated that it was of the belief that the petitioner had a liberty interest in not being labeled as a sex*

*offender.* Because the petitioner raised the issue of what effect his being labeled as a sex offender would have on his parole eligibility, this court then postponed further consideration of the merits of his petition until the parties conducted discovery.

On September 20, 2004, the petitioner filed an amended petition for a writ of habeas corpus (amended petition) in which he set forth three counts. Count one alleged deprivation of his liberty on the basis of a state statute that purported to condition parole eligibility on mandatory sex offender treatment. Following discovery, this count and all allegations concerning parole eligibility were withdrawn on December 30, 2004.

The case then went forward on count two of the amended petition, which alleged that the department of correction (department), which, in effect, is the same as the respondent, has labeled and stigmatized the petitioner as a sex offender and, by so doing, has deprived him of a liberty interest protected under the fourteenth amendment to the United States constitution and article first, §§ 8 and 10, of the constitution of Connecticut without due process of law. Count three under the amended petition alleges that the department-respondent has punished the petitioner without clear warrant of law in violation of article first, § 9, of the constitution of Connecticut. Because the evidence on the hearings regarding the motion to dismiss and the motion for reconsideration was not on the merits of the petition, this court proceeded with testimony on the merits of the petition by way of hearings on January 28, March 23 and April 8, 2005. Posttrial briefs were then filed by the parties, the last one being dated June 28, 2005.

When inmates enter the prison system, they are classified by the department on what it deems seven "risk scores" and seven "needs scores." The seven risk scores include length of sentence, history of violence and

severity of the current offense. Department of Correction Objective Classification Manual (2002 Ed.) p. 3 (manual). Each risk score is assigned a numerical value ranging from one to five, with one being the lowest risk and five being the highest risk in any given category. Id., p. 5. The department further assigns an overall risk score to each inmate that is equivalent to the highest score the inmate received for any of the seven factors. Id., p. 6. The respondent in the present case has assigned an overall risk score to the petitioner of S-3. Inmates are given a score of S-3 when they "have a current conviction, pending charge or *known history of sexual offenses involving physical contact with the victim*[s]." (Emphasis added.) Id., p. 36. This is, of course, *contrary* to the manual's statement: "*No charge for which the offender has been found not guilty or the charge nolled, or dismissed, may be used to determine any risk score.*" (Emphasis added.) Id., p. 4.

In addition, inmates are assigned ratings in "needs" categories, which include needs for substance abuse treatment, mental health treatment and sex offender treatment. Id., p. 3. Although the sexual offender treatment needs score is officially categorized as a needs score rather than a risk score, department policy provides that no inmate with a sexual offender treatment needs score of S-3 or above may receive a routine overall risk score reduction that reduces his score to below three without prior permission of the commissioner. Department of Correction Administrative Directive 9.2 (9), (10B) (2). The evidence at trial established that the commissioner has apparently granted such permission only once and that, therefore, "for the vast majority of inmates . . . a level S-3 score has all the [effect] of the level 3 risk score."

During the hearing on March 23, 2005, Monica Rinaldi-Ellison, a counselor's supervisor currently responsible

for department classification policy, gave the following explanation of the difference between a risk score and a needs score: "[A] needs score identifies needs for an inmate for programming needs. A risk score *drives the overall level* and where an inmate will be placed." (Emphasis added.) The sexual offender treatment needs score was officially characterized as a needs score rather than a risk score, but department policy provides that no inmate with a sexual offender treatment needs score of S-3, which the petitioner in the present case received, or above, may receive a routine overall risk score reduction that reduces his score to below three without prior permission of the commissioner of the department. At the May 13, 2000 hearing before this court, Fred Levesque, the department's director of classification, had this colloquy with the petitioner's attorney:

"Q. And is it true that a sexual offender treatment needs score of level three prevents an overall risk score of being reduced below level three?

"A. That's correct.

"Q. So, for the vast majority of inmates at the very least, a level S-3 score has all the effect of a level three risk score?

"A. That's for assessment."

The assignment of a sexual offender treatment needs score of S-3 to the petitioner reflects the department's judgment that he has a "known history of sexual offenses involving physical contact with the victim."

I

FACTS

As the result of an incident occurring on August 14, 1999, the petitioner was charged with the crimes of burglary in the first degree, assault in the third degree and sexual assault in the first degree. He denied any

sexual content to the incident and went to trial. *At trial, the petitioner was acquitted of the charge of sexual assault in the first degree.* The petitioner was convicted of the burglary and assault charges and was sentenced to ten years in prison, execution suspended after eight years, with five years probation for the burglary conviction and one year on the assault conviction to run concurrently to the sentence on the burglary conviction. He is presently serving that sentence.

## II

## STANDARD OF REVIEW

As stated previously, this is not an ordinary habeas petition claiming ineffective assistance of counsel, and, therefore, this court will not look for guidance to *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), as the seminal case in habeas matters.

The standard of review is whether the petitioner has a liberty interest in being labeled as a sex offender and whether such label is in violation of his constitutional rights. A further standard of review includes the credibility of the witnesses. This court evaluates such credibility on the basis of the witnesses' appearance and demeanor on the witness stand, the consistency and inconsistency of their testimony, their memory or lack thereof of certain events, whether they were candid and forthright or evasive and incomplete, their manner in responding to questions and, finally, *their bias and their interest or lack of interest in the case.*

## III

## CREDIBILITY

This court finds that the petitioner was a credible and reliable witness and that Garry Klinger, a fellow

inmate and witness for the petitioner, was also credible and reliable. Even the respondent in its brief found the petitioner to be credible and honest although Klinger was found not to be credible primarily based on the fact that the conviction for which he is presently incarcerated is larceny. The court, notwithstanding this conviction, finds Klinger to be a credible witness.

The court finds that the witnesses for the respondent were *not* credible except for certain admissions and that their testimony was designed to justify the policies of the department no matter how wrong some of these policies are. In particular, the court finds that the respondent's witness, Levesque, the department's director of offender classification, incredibly was not even aware of the aforementioned provision on page four of the 2001 edition of the department's objective classification manual:[1] *"No charge for which the offender has been found not guilty or the charge nolled or dismissed may be used to determine any risk score."* (Emphasis added.) Although Levesque did not indicate any awareness of the aforementioned provision in his testimony regarding the motion to reconsider the dismissal dated May 13, 2003, it is still nonetheless testimony before this court that it may utilize in evaluating Levesque's credibility.

*The credibility of the department is seriously undermined by its insistence on labeling the petitioner as a sex offender when he has been acquitted of that charge at trial.*

It is clear, and admitted by the respondent, that the department used the presentence investigation report

---

[1] The pertinent provisions of the 2002 edition of the department's objective classification manual are the same as those in the 2001 edition.

to make a determination that the petitioner is a sexual offender. It is true that on page four of the 2001 edition of the manual that it further states that a "nolled, dismissed or withdrawn information, which is part of another crime, may be used to determine needs scores based upon the description of the crime from police reports, [presentence investigation reports] or other reliable investigative reports." This is the authority that the department used to make a determination that the petitioner was a sex offender. This paragraph, however, talks about a nolled, dismissed or withdrawn information and does not mention the words "acquittal" or "not guilty." This court has to assume that the department deliberately omitted acquittals from those determinations that are based on a presentence investigation report or a police report. By the standards of statutory construction that apply here, the previous paragraph that used the words "not guilty" could have been placed in the paragraph mentioning police and presentence investigation reports, but the people preparing the department manual omitted "not guilty" in the paragraph authorizing the use of police and presentence investigation reports. This court finds, therefore, that presentence investigation and police reports were not intended to be used in a not guilty-acquittal scenario. Further, it is ridiculous to rely on a presentence investigation and police report merely containing the hearsay account of the petitioner's former wife as to what happened, an account the jury in the criminal case obviously did not believe.

This court finds it incredible that the petitioner has been labeled a sex offender and given an S-3 score on the basis of the foregoing, and the court finds that this *rigid* insistence on a wrongful policy seriously undermines the credibility of the department-respondent.

## IV

## ISSUES

### A

### Does the Petitioner Have a Liberty Interest in his Classification as a Sex Offender?

#### 1

#### Has the Respondent Labeled the Petitioner as a Sex Offender?

The respondent continues to insist that the department has not labeled the petitioner as a sex offender. This is totally contrary to the evidence. As stated previously, the assignment of a sexual offender treatment needs score of S-3 to the petitioner reflects the department's judgment that the petitioner has a "known history of *sexual offenses* involving physical contact with the victim." (Emphasis added.). In addition, the department's reclassification form labels Thomas as a "sexual offender (Score 3)" and further states, "no lower than level 3 due to sex offender needs." The manual is replete with references to sex offenders and sex offender needs scores. The fact that the reliance by the department-respondent on the presentence investigation hearsay from the alleged victim, the petitioner's former wife, has resulted in the department's conclusion that he has sex offender needs is additional evidence of referring to the petitioner as a sex offender. Further, the material from the University of Connecticut Health Center that would provide the sex offender with treatment was filled with references to sex offenders. Common sense indicates that one is not labeled as having a need for sex offender treatment if one does not have a history of sexual offenses, no matter how wrong that is in the present case. Furthermore, an expression commonly used in a nonlegal context states: "When it walks like a duck, acts like a duck and quacks like a duck, it *is*

a duck!" It is clear that the respondent-department uses the terms "sex offender needs" and "sex offender" interchangeably. The labeling of the petitioner as needing sex offender treatment and the designations by the respondent-department mentioned previously clearly mean that the respondent-department has labeled the petitioner as a "sex offender."

## 2

Has the Respondent Deprived the Petitioner of a Protected Liberty Interest Under the "Stigma Plus" Test Set Forth in *Paul* v. *Davis*, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)?

### a

Has the Petitioner Met the Stigma Test?

The short answer to this question is *yes*. *Paul* states that damage to an individual's reputation can constitute a due process claim when petitioners demonstrate the existence of two criteria: first, the utterance of a statement about them that is sufficiently derogatory to injure their reputation, that is capable of being proved false and that they claim is false. Second, some tangible and material state imposed burden or alteration of their status or of a right in addition to the stigmatizing statement. Id., 701–10. This court concludes that the petitioner has satisfied the first criterion in that his being labeled as a sex offender by the respondent-department is sufficiently derogatory to injure his reputation. *Kirby* v. *Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999), and *Chambers* v. *Colorado Dept. of Corrections*, 205 F.3d 1237, 1242–43 (10th Cir.), cert. denied, 531 U.S. 974, 121 S. Ct. 419, 148 L. Ed. 2d 323 (2000), have both held that inmates do have a liberty interest in not being labeled as sex offenders without due process. " '[W]e can hardly conceive of the state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a

sex offender." *Kirby* v. *Siegelman*, supra, 1292, quoting *Neal* v. *Shimoda*, supra, 131 F.3d 829. *Chambers* v. *Colorado Dept. of Corrections*, supra, 1241, found that the sex offender classification is a "highly stigmatizing label." *Pugliese* v. *Nelson*, 617 F.2d 916, 922 (2d Cir. 1980), states that a liberty interest that an inmate would normally expect to have is one of "fundamental decency and fairness." That exists in the present case. The petitioner has a right to expect to be free from being stigmatized as a sex offender on the basis of charges for which he has been acquitted. Fundamental decency and fairness require that his expectation be fulfilled. *Pugliese* is a 1980 case from the United States Court of Appeals for the Second Circuit. More recently, in *Doe* v. *Dept. of Public Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001), rev'd on other grounds, 538 U.S. 1, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003), the Second Circuit acknowledged the relevance of the stigma test to the sex offender label. In *Gwinn* v. *Awmiller*, 354 F.3d 1211, 1228 (10th Cir.), cert. denied, 543 U.S. 860, 125 S. Ct. 181, 160 L. Ed. 2d 100 (2004), the United States Court of Appeals for the Tenth Circuit held that classification as a sex offender during incarceration implicates a protected liberty interest under the stigma test. In *Gwinn*, the defendant had been charged with sexual assault in the first degree, but the charge was dropped as part of a plea agreement. The defendant had, nevertheless, been classified as a sex offender on the basis of allegations made by the alleged victim and contained in the police report. The court held that the defendant had a liberty interest protected by the due process clause under the stigma test. Id., 1217. *As to the first criterion of Paul, this court concludes that this labeling of the petitioner as a sex offender by the respondent is capable of being proved false and that the petitioner claims it is false. Further, although not required by Paul, it is clear that the sex offender label is false for the aforementioned reasons.* As for tarnishing the petitioner's reputation, the petitioner's witness, Klinger,

an inmate in the state prison in Somers, testified that inmates who are thought to be sex offenders are, "pretty much shunned and regarded, as you know, lowlifes . . . by other inmates." He went on to say, and the court believes him: "I was in the mess hall one afternoon during lunch, and a known sex offender sat down at a table right in front of me and the three other inmates who were at that table got up and walked away. . . . I have witnessed incidents of verbal abuse and physical abuse." Klinger further testified in referring to other inmates as sex offenders: "They've called them, you know, perverts, diddlers, other sorts of names probably not fit for [mention] in this court." It became evident from Klinger's testimony, that he, too, has been labeled as a sex offender by the respondent-department because he was charged with risk of injury to a child and sexual assault. In response to a question from the court, this witness said he was charged with risk of injury to a child as a derelict parent. "My stepdaughter came home from a party drunk and high. We disciplined her. She ran away from home, and I was subsequently arrested and charged with sexual assault fourth and risk of injury. Sexual assault fourth was nolled because nothing untoward occurred, so there was no basis in fact for it and no basis in fact for the risk of injury [charge] other than being a derelict parent."[2] The sexual assault charge was dismissed thirteen months later.

---

[2] To buttress further the falsity of the labeling of the petitioner as a sex offender is the testimony of classification director Levesque on May 13, 2003, when he stated: "[I]f there hadn't been a sexual assault charge, and if you didn't have the state's version that talks about the victim stating that she was forcibly sexually assaulted, then we wouldn't have a sex charge here. *We wouldn't have any sexual contact at all.*" (Emphasis added.) The presentence investigation report contains a description of a sexual assault based on the statement of the petitioner's former wife, and the police report contains only her allegations. As indicated, the labeling of the petitioner as a sex offender was based solely on his former wife's hearsay statements. It is undisputed that a sex offender needs score would not have been applied to him had he not had a charge of sexual assault that was based on only the former wife's statement. The petitioner has been labeled as a sex offender "with a known history of sex offenses" based only on allegations that are not only hearsay but which were rebutted by his acquittal of the charge.

In the decision by this court dated November 17, 2003, the court concluded that being labeled as a sex offender when there is no proof that a defendant has committed a sexual offense is *"seriously damaging to his reputation."* (Emphasis added.) In *Neal* v. *Shimoda,* supra, 131 F.3d 829, the Ninth Circuit Court stated: "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender." In *Kirby* v. *Siegelman,* supra, 195 F.3d 1292, the court held: "[T]he stigmatizing effect of being classified as a sex offender constitutes a deprivation of liberty under the Due Process Clause." The Tenth Circuit in *Chambers* v. *Colorado Dept. of Corrections,* supra, 205 F.3d 1243, also found the labeling of an inmate as a sex offender to be stigmatizing.

As previously stated, labeling an inmate as a sex offender damages his reputation within the prison population. It also damages his reputation among the employees of the department. The term "sex offender" is an all inclusive term that refers to several types of individuals such as sadistic, preferential child molesters and anger retaliatory rapists. Certainly the classification staff is aware of the petitioner's sex offender label. In *Neal* v. *Shimoda,* supra, 131 F.3d 830, the Ninth Circuit found that classification as a sex offender imposed a stigmatizing label regardless of whether the label had been disseminated. As counselor supervisor Rinaldi testified, correctional officers can obtain all of an inmate's risk and needs scores from the department's computer system. Additionally, employees of the University of Connecticut Health Center know which inmates have been recommended for participation in the sex offender program. That his sex offender status is available to correction officers is supported by the petitioner's testimony that a specific correctional officer referred to another inmate as a ripper in front of him, and the

petitioner testified that a ripper is a rapist, and a child molester is known as a diddler or a tree jumper. Additionally, the respondent has conceded that the petitioner's S-3 score will be disseminated to the board of pardons and paroles. Counselor supervisor Rinaldi testified that "if an inmate found out about another inmate's charges or crimes, that—you know, that could put staff in a situation where they could be at risk if an inmate were going to assault another inmate if they found out about his charges." David Guarino of the department testified that the department needs to pay attention to the fact that an inmate has been charged with a sexual assault when they are engaging in managing the risk of inmates. He further testified that that person has different needs. *"He may be victimized . . . we need to maintain that person's safety as well as the safety of our staff."* (Emphasis added.)

Even the Internet site for the department lists its treatment program for inmates with sexual offender treatment needs scores above S-2 as "The Sex Offender Program . . . a specialized program for inmates who have committed a sexual assault." Inmates and corrections officials can certainly access the department Internet site, and if they are aware, as previously indicated, that the petitioner has a sexual offender treatment needs score of S-3, his reputation is tarnished by the information from the site.[3]

*For the reasons previously stated, this court concludes that labeling the petitioner as a sex offender by the department-respondent seriously damages and tarnishes his reputation. The petitioner, therefore, has met the stigma test of Paul.*

[3] Although there is no substantial direct evidence of the tarnishing of the petitioner's reputation, it is a reasonable inference to conclude that he suffered harassment and ostracism as well as serious damage to his reputation.

b

Has the State (Department-Respondent) Imposed a Tangible and Material Burden on the Petitioner or Altered His Status or Right in Addition to the Stigmatizing Statement? Has the Petitioner Met the Plus Factor of the Stigma Plus Criteria in *Paul*?

The answer to these questions is *yes*. The tangible and material burden imposed by the state is explained in the petitioner's credible testimony as follows: "The consequences of my not having my overall risk score reduced means that I am not eligible for certain programs, minimum security facility, halfway house, work release, educational work release and community release, [in addition to] T.S., that is, transitional back into the community." In fact, the respondent concedes that the petitioner's S-3 score permanently disqualifies him from any eligibility for residential program placement or outside work clearance. The petitioner also testified that he is trying to get into the culinary arts program and any educational release program he can but that he has not been able to enter these programs because he is a level three. He further testified that this is his first incarceration and that he needs a halfway house or community release type of program. Otherwise, he is going to get caught back in the system. He does not have anywhere to go unless he is able to get into one of these programs so that he can do something when he gets out. That is, he needs programs so that he can make a successful transition back into the community. He is being denied these programs because he has a sexual offender treatment needs score and risk score of S-3. Being improperly labeled as a sex offender and given an S-3 status constitutes an alteration of his status or right to be labeled an S-1, which would have been his label on entrance to the prison system if he had not been mislabeled as a sex offender. In addition,

the evidence clearly shows that he has suffered harassment and ostracism by being falsely labeled as a sex offender. All of this is a substantial burden, both tangible and material, imposed on him by the state. It meets, as mentioned, the second criteria of *Paul.*

The court observed in *Paul* v. *Davis,* supra, 424 U.S. 707–708, that where the action is governmental in nature, it constitutes a "plus" factor that triggers constitutional protection. In the present case, the false labeling of the petitioner as a sex offender by the department-respondent is certainly governmental in nature.

*Accordingly, this court concludes that the petitioner has met the stigma plus test under Paul and Doe, and that he has a liberty interest under the due process clause of the fourteenth amendment to the United States constitution. This liberty interest has been violated by the department-respondent.*[4]

## B

### Respondent's Claims

### 1

The respondent has made several assertions that are contrary to the evidence. First, the respondent claims that the petitioner has focused on a claim that he has a right to be housed in a minimum security facility. The court finds that the contrary is both true and obvious. The petitioner has *not* focused on that alleged right, but rather the focus has *clearly* been on his falsely being labeled as a sex offender and the negative consequences as a result of that. He has focused on the

---

[4] It should be noted that had the petitioner been charged only with the count of sexual assault, he would be entitled to an erasure of the police report and the presentence investigation report used by the respondent to assign the S-3 score. He would also be entitled to answer that he had never been arrested on such a charge. See General Statutes § 54-142a (a). In fact, having been acquitted of the sexual assault charge but being punished for the same charge by the department-respondent, his right against double jeopardy has also been violated.

various rights that he would have if he were not so falsely labeled, i.e., his rights to residential program placement, outside work clearance and various educational programs, all as mentioned previously.

### 2

The respondent has also claimed in the posttrial brief that the petitioner has not appealed from his classification and has, therefore, waived his right to due process. This is also contrary to the evidence and the law. There is no exhaustion of remedies requirement in the state habeas statute as there is in the federal statute. The purpose of the exhaustion requirement is to provide notice and an opportunity to resolve problems. The department-respondent has, however, been on notice for more than three years that it has assigned the petitioner an S-3 score on the basis of a charge for which he was acquitted and, during the same time, the *petitioner has had several classification reviews.* The petitioner has been told repeatedly that his designation as a sex offender is permanent. No one ever notified him that he was entitled to a hearing, and the evidence clearly demonstrates that a hearing would have accomplished nothing. The petitioner testified as follows: "When I arrived at [McDougall-Walker Correctional Institution] in classifications with counselor supervisor Golumbo, and I inquired again about this—my being a level three, and she basically told me, 'Well, it's not going to change, it will always be a level three, if you don't like it, file a habeas.'" In view of all of this, this court is not going to penalize the petitioner for not acting further in what would have been an exercise in futility.[5]

### 3

Several of the cases cited by the respondent are inapposite to the factual situation in the present case. Some

[5] This claim by the respondent also places form over substance.

involve the fifth amendment to the United States constitution, some involve having to register as a sex offender outside the prison system and have the registrant's classification available to the public and some involve situations in which the petitioner has been *convicted of a sexual offense.* As it has been stated many times in this memorandum of decision, the petitioner in the present case was acquitted of the charge of sexual assault.

*What further distinguishes this case from all of the cases cited by the department-respondent is that here, it has violated its own regulations set forth on page four of the manual. Under those regulations, the original charge of sexual assault, the presentence investigation report and the police report all should not have been considered in establishing the classification of the petitioner as a sex offender.*

C

Does the Petitioner Have a Liberty Interest in Not Being Labeled as a Sex Offender Under the Holding of *Sandin* v. *Conner,* 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)?

Again, the answer is *yes.* The respondent claims that *Sandin* is contrary to the positions of the aforementioned cases holding that an inmate has a liberty interest in not being labeled as a sex offender. The holding of *Sandin* is based on a factual situation in which the inmate was given thirty days of segregation for charges on which he was found guilty as a result of a disciplinary hearing. *Sandin* held that confinement or restriction, such as segregated confinement, does not present a liberty interest and does not work a major disruption on the inmate's environment and does not present the type of atypical significant deprivation in which a state might conceivably create a liberty interest. The court did hold, however, that states may, under certain cir-

cumstances, create liberty interests for state prison inmates that are protected by the due process clause of the fourteenth amendment to the United States constitution in a case *in which the actions impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."* (Emphasis added.) Id., 484.

The present case is distinguished from *Sandin*'s holding as to the inmate, but is in compliance with the dicta of *Sandin*. In the present case, the actions of the state in labeling the petitioner as a sex offender under the circumstances previously described do present the type of atypical, significant deprivation that creates a liberty interest. The Second Circuit, which has jurisdiction over our area, has described an "atypical and significant hardship" as "a hardship that is substantially more grave than hardships [the inmate] would be likely to endure simply as a consequence of the ordinary administration of the prison." *Welch* v. *Bartlett*, 196 F.3d 389, 392 (1999), aff'd after remand, 125 Fed. Appx. 340 (2d Cir. 2005). In *Neal* v. *Shimoda*, supra, 131 F.3d 829, the Ninth Circuit noted: "The classification of an inmate as a sex offender is precisely the type of 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' that the Supreme Court held created a protected liberty interest [in *Sandin*]."

This court found in its decision dated November 17, 2003, denying the respondent's motion to dismiss that "[b]eing labeled a sex offender had an impact on the petitioner which exceeded the expected circumstances in an unexpected manner." It is clear to this court that wrongfully labeling the petitioner as a sex offender with an S-3 overall risk score results in his being burdened by an atypical and significant hardship in that it is substantially more grave than hardships the inmate would be likely to endure simply as a consequence of the ordinary administration of the prison. This hardship has been previously described as that he had a right not to

be labeled as a sex offender when he had been acquitted of sexual assault. The hardship on the petitioner, therefore, exceeded the expected circumstances in an unexpected manner. The hardship is the harassment and ostracism the petitioner suffers as a result of being wrongfully labeled as a sex offender. Further, by being mislabeled as a sex offender, his sexual offender treatment needs score and his overall risk score are not reduced below S-3, thereby making the petitioner ineligible for residential program placement, outside work assignments and facility based work release as well as educational programs and participation in the transitional supervision program and the transitional housing programs. Participation in these programs would facilitate his successful reentry into the community. The stigmatization and restrictions that result from the sex offender label previously described constitute an *atypical and significant hardship.*

Accordingly, this court finds that the petitioner does have a liberty interest under the *Sandin* standard, and that liberty interest has been violated by the department-respondent.[6]

### D

### Has the Petitioner Been Punished Without Clear Warrant of Law in Violation of Article First, § 9, of the Constitution of Connecticut?

The answer is *yes!* This claim by the petitioner has been made for the first time as count three in his amended petition.

---

[6] The respondent cites *McKune* v. *Lile*, 536 U.S. 24, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002), in opposition to the petitioner's claim that he has a liberty interest under the *Sandin* standard and the various other aforementioned cases. *McKune*, however, is inapposite to the present case. In *McKune*, the petitioner conceded that no liberty interest was implicated and claimed a violation of his right against self-incrimination, which was a violation of the fifth amendment to the United States constitution. Also, *McKune was convicted of a sexual offense.*

Article first, § 9, of the constitution of Connecticut provides as follows: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

The parties agree that the question of whether the sanctions imposed on the petitioner constitute punishment under the aforementioned provision of the constitution of Connecticut is a case of first impression. The petitioner states so in his reply brief. The respondent agrees by his comment in his brief in which he states that the petitioner's legal theory under the constitution of Connecticut is "unprecedented and without any persuasive authority or logic." This court concludes that the fact that this is a case of first impression does not preclude this court from deciding it.

In an attempt to diminish article first, § 9, of the constitution of Connecticut, the respondent refers to it as a "simple phrase." It is not a phrase; rather, it is a sentence. Further, the respondent should be aware that "[u]nless there is some clear reason for not doing so, effect must be given to *every part of and each word* in the constitution . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Wilkins*, 240 Conn. 489, 505–506, 692 A.2d 1233 (1997).

The respondent argues that in determining what is punishment, the courts in the few cases in which reference has been made to punishment concentrate on whether a statute is punitive, and the respondent argues that any possible punishment of the petitioner is based on the policies of the department and not a statute. The respondent overlooks the fact, however, that policies in the form of regulations are approved by our state's General Assembly and have the force of a statute. Further, any policy of the state government that includes any policy of a state agency is unconstitutional if it

violates article first, § 9, of the constitution of Connecticut.

This court concludes that the petitioner has been and is being punished without clear warrant of law. It has already been established earlier in this memorandum of decision that the petitioner was wrongly classified as a sex offender by the department, as a result of which the petitioner has been and is ineligible for a level reduction to an overall risk score of two as well as for residential program placement, outside work assignments, facility based work release and educational and job training programs. The petitioner has testified before this court that he is concerned that if he does not have a proper transition into the community through the aforementioned programs, he is afraid that there will be a tendency to commit crime and he will have to return to prison. Additionally, the petitioner's reputation has been seriously damaged by his being designated as a sex offender. This designation has placed him in danger of physical assault, harassment and ostracism. He has already undergone harassment and ostracism.

The petitioner expected that he would be punished as a person convicted of assault, burglary and the like, but he also has a right to no expectation of being punished for sexual assault, a charge of which he was acquitted at trial. By subjecting the petitioner to the consequences of being wrongfully designated as a sex offender, he has received and will continue to receive punishment beyond his justified expectation.

There are two cases that have been cited by the parties and that bear comment on the issue of punishment. *State* v. *Alexander*, 269 Conn. 107, 847 A.2d 970 (2004), is inapposite factually to the present case. In *Alexander*, the issue was whether a restraining order in a domestic violence case was punishment of the defendant. The court found that it was not punishment

of the defendant but, rather, the restraining order had been enacted for the benefit of the victim. *Alexander* cited *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963), as to various factors that could help in making the determination as to what is punishment. All of the seven factors in *Kennedy*, however, are not applicable to the present case. Of course, this court is not bound by *Kennedy* on the basis of the decision in *State* v. *Wilkins*, supra, 240 Conn. 505, in which the court stated: "We have also held that article first, § 9, [of the constitution of Connecticut] provides protections beyond those afforded by the fourth amendment." "It is well settled that we are not bound by the decisions of the United States Supreme Court in interpreting the contours of article first, §§ 7 and 9. . . . It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Moreover, we have held that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort." (Citations omitted; internal quotation marks omitted.) Id., 504.

Although article first, § 9, of the constitution of Connecticut supersedes federal law, and this court has independently found that the petitioner has been and is subject to punishment without clear warrant of law, a review of some of the factors in *Kennedy* can shed some light on what is punishment in the present case. The *Kennedy* factors are as follows: "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence,

whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." *Kennedy* v. *Mendoza-Martinez,* supra, 372 U.S. 168.

The first *Kennedy* factor, namely, that the "the sanction involves an affirmative disability or restraint" demonstrates that the department has punished and is punishing the petitioner. The respondent, in naming the petitioner as a sex offender, even though he was acquitted of the charge, has placed sanctions on him that involve affirmative disability and restraints; namely, the aforementioned ineligibility for various beneficial programs. The sanction of being labeled as a sex offender has promoted and is promoting the traditional aims of punishment—retribution and deterrence. As for retribution, the petitioner is being burdened by harassment, ostracism and the like, and by being restricted from taking advantage of the various programs that would enable him to make a better transition to society.

The purpose of assigning the petitioner a sexual offender treatment needs score of S-3 is to refer him to the sex offender program, thereby hoping it will act as a deterrent to future sex crimes. This demonstrates just how ridiculous the actions of the department-respondent are in the present case. What is the point of attempting to deter future sex crimes when there is no credible evidence that the petitioner has committed a sex crime, a charge of which, as stated repeatedly, he was acquitted? What is the point of deterrence when there is no condition to be treated?

Furthermore, by giving the petitioner a score of S-3, he has been incarcerated in a higher security prison, which, of course, is much more restrictive on him.

Therefore, the department-respondent's restriction of him is punishing him even more.

Additionally, the court agrees with the petitioner that the severity of being designated as a sex offender is wholly excessive as a sanction for a nonexistent offense. This is another factor delineated in *Kennedy*. See id., 168–69. Accordingly, at least four of the factors set forth in *Kennedy* have been met in the instance of the petitioner here. Even though this court is not bound by *Kennedy*, these four factors clearly support the conclusion that a governmentally imposed sanction, the department's wrongful labeling of the petitioner as a sex offender, constitutes punishment.

As to what constitutes punishment "without clear warrant of law," under article first, § 9, of the constitution of Connecticut, punishment on the basis of a charge of which the petitioner was acquitted is entirely unwarranted by law. Punishing someone for a crime that they did not commit is certainly unwarranted by law.

This court, therefore, concludes that the respondent has violated and is violating the rights of the petitioner under article first, § 9, of the constitution of Connecticut, which provides that "[n]o person shall be arrested, detained or *punished*, except in cases clearly warranted by law." (Emphasis added.)[7]

V

CONCLUSION AND ORDER

This court concludes that the petitioner does have a liberty interest in not being labeled as a sex offender and that that liberty interest has been violated by the

---

[7] In *State* v. *Wilkins*, supra, 240 Conn. 505, our Supreme Court clearly found that article first, § 9, should not be interpreted too narrowly and is a source of broader protection of individual rights than the federal constitution.

department-respondent in so labeling him. Furthermore, by so labeling him, the department-respondent has burdened him with an atypical and significant hardship, and the department-respondent is punishing the petitioner without clear warrant of law in violation of article first, § 9, of the constitution of Connecticut. The petitioner's amended petition for a writ of habeas corpus is, therefore, granted.

Accordingly, the department-respondent is hereby ordered to purge all of its records, documents and computer files of any reference to the petitioner as a sex offender or as being in need of sex offender treatment, and to reduce his overall risk score and sex offender treatment needs score accordingly and to rely no further on any sex offender charge, police report or presentence investigation report as they relate to the petitioner's having committed a sexual offense in classifying him.

In closing, the court would like to note that it appreciates the dedication and professionalism of the state attorney general's office and the Jerome N. Frank Legal Services Organization of the Yale University School of Law, in particular, attorney Brett Dignam and law student interns Melissa Miksch and Max Weinstein, and the law student interns who preceded them in this case.